# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JOE SMITH,<br><br>        Plaintiff,<br><br> v.<br><br>NICHOLAS & CO. FOODSERVICE, LLC, *et al.*,<br><br>        Defendants. | Case No. 2:18-cv-0256-KJD-CWH<br><br>**<u>ORDER</u>** |

  Before the Court is defendant Nicholas & Co. Foodservice, LLC's motion for summary judgment (#17) to which plaintiff Joe Smith responded (#21), and Nicholas & Co. replied (#25).

  Joe Smith worked for Nicholas & Co. Foodservice for a little over two years. For most of that time Smith was a delivery driver, but six months before his termination Smith earned a promotion to Night Lead Driver. Shortly thereafter, Smith was discharged after a shipping breakdown on his watch resulted in delayed orders to several Nicholas & Co. customers. Smith thinks that Nicholas & Co. fired him because of his race. He claims that his supervisor, Christopher Howard, showed a pattern of discrimination against him and other African-American employees that rises to the level of disparate treatment under Title VII. Nicholas & Co. tells a different story. It argues that Smith's failure to adequately perform his duties as Night Lead Driver—not his race or color—was the true cause of his termination.

  Smith's Title VII claim presents the familiar burden-shifting analysis of <u>McDonnel Douglas v. Green</u>. 411 U.S. 792 (1973). <u>McDonnel Douglas</u> requires Smith to bring a prima facie case of discrimination. If he does, the burden shifts to Nicholas & Co. to present a legitimate and nondiscriminatory reason for terminating Smith's employment. If the company does so, the burden shifts back to Smith to demonstrate that Nicholas & Co.'s justification for

Smith's termination was pretextual. Although Smith meets his first burden and presents a prima facie case of unlawful discrimination, he has not shown that his termination was pretextual. Accordingly, the Court grants summary judgment in favor of Nicholas & Co. Foodservice, LLC.

## I. Background

### A. Factual Background

Joe Smith started with Nicholas & Co. as a delivery driver in June of 2015. Howard Decl. 2 ¶ 3, ECF No. 17 Ex. B. As a delivery driver, Smith was tasked with safely delivering and unloading client orders on his assigned route. Def.'s Mot. Summ. J. 3, ECF No. 17. Smith's time at Nicholas & Co. began like many others—with new-hire paperwork. That paperwork included Nicholas & Co.'s Rules of Conduct and its non-discrimination, anti-harassment, and non-retaliation policies Id. at Ex. A-1, A-2. Smith acknowledged receipt of those documents by signature. Id. at Ex. A-3. Smith reported to transportation supervisor Christopher Howard. Howard Decl. ¶ 2.

According to Smith, friction between he and Howard started almost immediately. About a month after Smith started, he claims that Howard began critiquing his work ethic and job performance. Smith Dep. 55:9–17, ECF. No. 17 Ex. C. Specifically, Howard would ask Smith "[h]ow come these guys say that you are lazy around here?" and "they don't want to work with you?" Id. at 55:9–10. These comments upset Smith who believed his performance to be more than adequate. Smith asked his coworkers if Howard asked them similar questions. They assured Smith that he did not. Id. at 60:24–61:2. Because none of Smith's non-black coworkers received the same treatment, Smith assumed Howard's comments were racially motivated.

Despite the friction between Smith and Howard, Nicholas & Co. promoted Smith to Night Lead Driver in January of 2017. Howard Decl. at 2 ¶ 7. As Night Lead, Smith took on additional responsibilities. He covered for absent drivers, trained new drivers, and supported Howard as transportation supervisor. Def.'s Mot. Summ. J. Ex. A-5. The promotion did not ease the perceived tension between Smith and Howard. Smith felt that Howard did not trust him with the added responsibilities as Lead Driver. Namely, he claims that Howard excluded him from participating in job-applicant interviews and hiring decisions—decisions that Smith's non-black

predecessor made regularly. Smith Dep. at 97:13–16. The tension boiled over when Howard refused to hire four African-American applicants that Smith referred. Id. at 105:18–19. That led Smith to lodge two complaints about Howard to Nicholas & Co.'s vice president of Nevada operations, Nonda Diamant. The gist of each complaint was that Howard was treating African-American employees and applicants worse than their non-African-American coworkers. Id. at 103:22, 105:21.

Not long after Smith's second complaint, there was a communications breakdown in the shipping yard that delayed several delivery routes. Smith was the Night Lead on duty during the delay. He arrived at the yard around 2:00 a.m. to discover the delays but did not notify Howard of the issues as he had done in the past. Howard Decl. 3 ¶ 17–18. When Howard arrived at 7:00 a.m., he confronted Smith about the delayed routes. Id. at 3 ¶ 19. Howard felt that Smith's answers were evasive or untruthful. Id. at 3–4. Howard suspended Smith pending an investigation into Smith's actions that night. The purpose of the investigation was to determine whether Smith violated any Nicholas & Co. rules or policies during the shipping breakdown. The investigation concluded that Smith had ignored the shipping delays, that he had neglected his duties as Night Lead, and that he had been untruthful with Howard. Id. at 4 ¶ 27. Howard then made the ultimate decision to discharge Smith. Id. at 4 ¶ 29.

### B. Procedural Background

Smith appealed his termination internally to no avail. He then filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC") and Nevada Equal Rights Commission ("NERC"). Def.'s Mot. Summ. J. Ex. E-1, ECF No. 17. However, the EEOC discovered Smith's corresponding NERC claim and dismissed its case in favor of the Nevada administrative action. Id. at Ex. E-2. The EEOC mailed Smith a right-to-sue letter on November 16, 2017. Errata to Pl.'s Resp. Summ. J., ECF No. 23 Ex. 2. Rather than await the NERC decision, Smith filed this suit. That forced NERC to also dismiss Smith's case against Nicholas & Co. Def.'s Mot. Summ. J., ECF No. 17 Ex. E-2. The parties have completed discovery, and Nicholas & Co. seeks summary judgment.

## II. **Legal Standard**

The purpose of summary judgment is to avoid unnecessary trials by disposing of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986); Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture, 18 F.3d 1468, 1471 (9th Cir. 1994). It is available only where the absence of material fact allows the Court to rule as a matter of law. Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 322. Rule 56 outlines a burden shifting approach to summary judgment. First, the moving party must demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to produce specific evidence of a genuine factual dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine issue of fact exists where the evidence could allow "a reasonable jury [to] return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court views the evidence and draws all available inferences in the light most favorable to the nonmoving party. Kaiser Cement Corp. v. Fischbach & Moore, Inc., 793 F.2d 1100, 1103 (9th Cir. 1986). Yet, to survive summary judgment, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

## III. **Analysis**

### A. **Smith Did Not Fail to Exhaust Administrative Remedies**

Nicholas & Co. argues that summary judgment is appropriate because Smith failed to exhaust his administrative remedies before he filed suit. Generally, a Title VII claimant must file a claim with the appropriate administrative agency—EEOC or NERC—before filing suit in federal court. Surrell v. Cal. Water Svc., Co., 518 F.3d 1097, 1103 (9th Cir. 2008). The agency may elect to bring suit as a result of the complaint, or it may not. If not, the agency must inform the complainant that it has elected not to bring suit and communicate whether the complainant may sue on its own. 42 U.S.C. § 2000e-5(f)(1). That communication is known as a right-to-sue letter. The letter advises the complainant that it has ninety days to file suit or risk being time barred. Id.

Though important, failure to receive a right-to-sue letter is not an absolute bar to a federal suit. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982). Because the right-to-sue

letter is not itself a bar to federal jurisdiction, the Court treats the right-to-sue requirement like a statute of limitations, which is subject to waiver, estoppel, and equitable tolling. Id. Thus, a minor imperfection with the agency's notice of rights does not necessarily bar a subsequent law suit.

Here, Smith received his right-to-sue letter from the EEOC in November of 2017. Pl.'s Errata to Resp. Summ. J. Ex. 2, ECF. No. 23. Smith then had ninety days to file suit, which he did on February 12, 2018. See Compl., ECF No. 1. Nevertheless, Nicholas & Co. argues that Smith failed to exhaust because he did not allow the EEOC or NERC to complete their own investigations before he sued. Def.'s Mot. Summ. J. 28, ECF No. 17. It may be true that Smith's lawsuit prevented a thorough NERC investigation into Smith's discharge. Id. Ex. E-2 (email from NERC to Anne T. Freeland explaining that both the EEOC and NERC claims were prematurely dismissed). However, the right-to-sue letter did not inform Smith that the timing of his lawsuit prevented the agencies from conducting their investigations. It merely advised him that "based upon [the EEOC's] investigation, the EEOC [was] unable to conclude" that Nicholas & Co. violated Title VII. Errata Ex. 2, ECF. No. 23. From there, Smith merely followed the letter's instructions and filed suit within the ninety days. Accordingly, the Court declines to grant summary judgment based on Smith's failure to exhaust his administrative remedies.

**B. Smith's Title VII Claim**

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e(a)(1). The statute breaks into two sections. Each prohibits one type of employment discrimination. The first section prohibits an employer from terminating an employee or refusing to hire an applicant due to race, color, religion, sex, or national origin. Id. § 2000e(a)(1). This is known as the "disparate treatment" or "intentional discrimination" provision. E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 135 S.Ct. 2028, 2032 (2015). The second section bans any practice that deprives employees of opportunities because of their race, color, religion, sex, national origin. 42 U.S.C. § 2000e(a)(2). This is known as the "disparate impact" provision. Abercrombie, 135 S.Ct. at 2032.

The "disparate treatment" and "disparate impact" provisions represent the only causes of

action under Title VII. Id. Before the Court reaches the merits of Smith's complaint, it must determine whether Smith's claim is for disparate treatment or disparate impact. Smith's complaint presented one federal cause of action titled "Unlawful Discrimination Based on Color, Race, and Retaliation." Compl. at 5. Smith complains that Nicholas & Co. intentionally discriminated against him and ultimately terminated his employment because of his race. This is a claim for direct discrimination proscribed by § 2000e(a)(1)'s disparate treatment provision. Accordingly, Smiths' claim implicates § 2000e(a)(1)'s ban on disparate treatment.

Less clear from the complaint is which theory—or theories—Smith intends to pursue to prove his disparate treatment claim. Because Title VII breaks down into two causes of action, a plaintiff need not plead a separate cause of action for each type of discrimination suffered. Instead, the plaintiff may show disparate treatment under multiple theories. These include harassment, hostile work environment, and wrongful termination. See Faragher v. City of Boca Raton, 524 U.S. 775 (1998) (harassment); Penn. State Police v. Suders, 542 U.S. 129 (2004) (hostile work environment); Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 659 (9th Cir. 2002) (wrongful termination).

The Court finds two theories in Smith's complaint: wrongful termination and retaliation. He claims (1) that Christopher Howard engaged in a pattern of race discrimination that ultimately resulted in his discharge; or, alternatively (2) that Nicholas & Co. terminated Smith's employment because Smith complained about Howard to Howard's supervisor, Nonda Diamant. If proven, either theory could support a Title VII claim. Thus, the Court will analyze each theory separately below.

Smith's complaint also brings a state cause of action under NRS § 613, Nevada's equal-employment statute. Compl. at 5. That claim makes the same arguments as Smith's Title VII claim just under Nevada law. The analysis for a claim arising under NRS § 613 is nearly identical to a claim under Title VII. See Apeceche v. White Pine Cnty., 615 P.2d 975, 977 (Nev. 1980). Accordingly, the Court will not analyze Smith's Title VII and NRS § 613 claims separately because a genuine issue of material fact on one would prevent summary judgment on the other.

Assured that Smith's claims implicate Title VII, the Court turns to the applicable standard. Title VII claims prompt the familiar burden-shifting framework set out in <u>McDonnel Douglas v. Green</u>. 411 U.S. 792 (1973). Of note, the burden of persuasion always lies with Smith; it does not shift to the Nicholas & Co. at any point. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993). <u>McDonnel Douglas</u> only shifts the burden of production between the parties. <u>See id.</u> The process starts with Smith who must produce evidence of a prima facie case of unlawful discrimination. <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252–53 (1981). Smith meets that burden if his evidence "give[s] rise to an inference of unlawful discrimination." <u>Id.</u> A prima facie case of discrimination "creates a presumption that the employer unlawfully discriminated against the employee." <u>Id.</u>, at 254. The prima facie standard presents a low bar. Indeed, Smith's burden of production is lower than the preponderance of the evidence. <u>Aragon v. Republic Silver State Disposal, Inc.</u>, 292 F.3d 654, 659 (9th Cir. 2002).

If Smith succeeds, the burden shifts to Nicholas & Co. to offer a "legitimate, nondiscriminatory reason" for Smith's discharge. <u>E.E.O.C. v. Boeing Co.</u>, 577 F.3d 1044, 1049 (9th Cir. 2009). If Nicholas & Co. provides such a reason, it rebuts the presumption of discrimination created by Smith's prima facie case. The presumption then "drops from the case." <u>Hicks</u>, 509 U.S at 508. At that point, the burden reverts back to Smith who has the "full and fair opportunity to demonstrate . . . that the proffered reason [for his discharge] was not the true reason . . . and that race was." <u>Id.</u> (citing <u>Burdine</u>, 450 U.S. at 256); <u>Surrell v. Cal. Water Svc. Co.</u>, 518 F.3d 1097, 1106 (9th Cir. 2008). At that point, Smith must prove Nicholas & Co.'s discrimination by the preponderance of the evidence.

### 1. **Smith Has Made a Prima Facie Showing of Unlawful Discrimination**
#### a. **Smith's Wrongful Termination Claim**

Smith uses a wrongful termination theory to argue that he suffered disparate treatment. Put simply, Smith argues that he "was fired because Howard did not like [him] personally and he did not like the color of [Smith's] skin." Def.'s Mot Summ. J. at 21. Smith's first task is to present a prima facie case of wrongful termination. There are four factors. Smith must show: (1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that Nicholas & Co. treated similarly situated,

| 1 | non-black employees better than Smith. <u>Hicks</u>, 509 U.S. at 506; <u>Aragon</u>, 292 F.3d at 658. As for
| 2 | the first prong, the parties agree that Smith is a member of a protected class as Title VII applies
| 3 | to every racial group. <u>Aragon</u>, 292 F.3d at 659. They disagree about everything else.

Turning first to Smith's qualifications, the Court finds that Smith was qualified for each position that he held at Nicholas & Co. Smith started as a delivery driver in June of 2015. Howard Decl. 2 ¶ 3. Other than Howard's off-hand comments about Smith's work ethic, there is no evidence that he performed less than admirably. This is supported by the fact that Nicholas & Co. promoted Smith to Night Lead Driver in April of 2017. Def.'s Mot. Summ. J. Ex. E-5. The promotion came with a pay-raise and additional responsibilities. Diamant Decl. at 3, ECF No. 17 Ex. A. It is unlikely that Nicholas & Co. would promote Smith, pay him more, and entrust him with more responsibility if it was dissatisfied with his performance. It is more likely that Nicholas & Co. thought Smith was qualified for his position as recently as April of 2017. Therefore, the Court finds that for purposes of Smith's prima facie case, he was qualified for his position.

Next, Smith suffered an adverse employment action; he was terminated. Indeed, the Court can fathom no more adverse an employment action than termination. <u>Little v. Windermere Relocation, Inc.</u>, 301 F.3d 958, 970 (9th Cir. 2002) ("of course, termination of employment is an adverse employment action").

Finally, Smith argues that similarly situated non-black delivery drivers were treated better than he because they did not suffer Howard's derogatory remarks about their performance and work ethic. Smith's coworkers are similarly situated if both their jobs and their conduct were like Smith's. <u>Vasquez v. Cnty. of Los Angeles</u>, 349 F.3d 634, 641 (9th Cir. 2003) ("individuals are similarly situated when they have similar jobs and display similar conduct"). As for their jobs, Smith and his coworkers were all delivery drivers. They worked in the same department and had the same responsibilities. As for their conduct, there is no evidence that Smith acted any differently than the other driver. He was never disciplined or cited. If anything, Smith outperformed his coworkers based on his promotion to Night Lead. According to the evidence, the only real difference between Smith and his coworkers was that Smith was African-American.

Therefore, he is similarly situated to the other delivery drivers.

Yet, Howard questioned Smith's work ethic but no one else's. On different occasions, Howard asked Smith why people were saying he was lazy and refusing to work with him. Id. at 55:11–17, 56:1–15, 57:9–18. Smith asked several of his coworkers if Howard also disparaged them. Id. at 55:22–24. He did not. Id. As a result, at the prima facie stage, it is reasonable to conclude that Smith—the only African-American driver—received Howard's disparaging comments because of his race. [1] Accordingly, Smith has met the low burden necessary to show that his similarly situated, non-black coworkers received better treatment than he.

### b. Smith's Retaliation Claim

Although Smith made a prima facie case for his wrongful termination theory, Smith has not done so with his retaliation claim because he has not shown that his complaints about Howard caused his discharge. Smith complained twice about Howard's alleged racial bias. He directed both complaints to Nonda Diamant, Nicholas & Co.'s Nevada Vice President. Initially, Smith complained that Howard excluded him from participating in job interviews despite his promotion to Night Lead. Smith Dep. at 97:11. He argues that prior Night Lead Drivers participated in job interviews and made hiring decisions. Id. Later, Smith complained that Howard refused to hire four African-American drivers that Smith referred because of their race. Id. at 105:17–20. Smith argues that those two complaints are the real reason Nicholas & Co. discharged him.

A prima facie case of retaliation has three prongs. Smith must show: (1) that he engaged in an activity protected by Title VII; (2) that he suffered an adverse employment decision; and (3) that his participation in the protected activity caused the adverse employment decision. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002). Smith meets the first

---

[1] Nicholas & Co.'s motion for summary judgment separates Smith's argument that Howard singled him out and maligned his work ethic into its own harassment or hostile work environment theory. This is understandable as Smith's complaint and opposition are not exactly models of clarity and barely hint at what theories he believes prove his Title VII claim. Rather than separate the claims into a wrongful termination and hostile work environment claim, the Court considered all of Smith's evidence of disparate treatment as part of his wrongful termination theory. However, even if the Court analyzed Smith's claim as one for hostile work environment based on Howard's comments, it would fail because each of Howard's comments to Smith were performance-based—not race-based. See Surrell v. Cal. Water Svc. Co., 518 F.3d 1097, 1108–09 (9th Cir. 2008) (performance-based comments not enough to make a prima facie case for hostile work environment).

two prongs. First, Smith's complaints to Diamant were protected by Title VII. Title VII protects an employee who files an internal complaint alleging racism as if the employee filed the complaint with a governmental agency. Id. (citing Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992). Second, Smith suffered an adverse employment action; he was terminated. Little, 301 F.3d at 970.

Smith's retaliation claim stalls there, however, because he cannot show that his complaints to Diamant were the but-for cause of his termination. The Court applies the traditional "but-for" standard to determine causation in Title VII retaliation claims. Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). Thus, at the prima facie stage Smith must show that but for his complaints to Diamant, he would not have been terminated. Ruggles v. Cal. Polytechnic State Univ., 797 F.2d 782, 785 (9th Cir. 1986). An important part of the analysis is whether the length of time between the employee engaging the protected activity and the employer imposing the adverse employment action is very short. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Indeed, a "very close" temporal relationship between the protected activity and adverse employment action alone could make a prima facie case. Id. Also helpful is whether an intervening event could have caused the adverse employment action. See Manatt v. Bank of America, N.A., 339 F.3d 792, 802 (9th Cir. 2003) (intervening events that also explain the employer's motives could break the chain of causation).

Smith has not shown causation because the time between his complaints and discharge are too far apart and the July 18 shipping breakdown was an intervening event that explains Smith's discharge. Smith first complained to Diamant around June 6, 2017. Diamant Decl. at 4 ¶ 20, ECF No. 17 Ex. A. About a month-and-a-half passed before he was suspended or terminated. See Howard Decl. 4 ¶ 24, Diamant Decl. 4 ¶ 20. Admittedly, the timing between Smith's complaint and his termination appears close. However, the temporal proximity between the shipping breakdown and Smith's termination—six days—is more indicative of Nicholas & Co.'s reasoning than Smith's two complaints six weeks earlier.

Further, even if the time between Smith's complaints and his termination were closer, there is no evidence that Howard was aware of Smith's complaints before the termination.

Evidence that Howard knew of Smith's complaints prior to Smith's termination is "essential to [show] a causal link" between those events. See Cohen v. Fred Meyer, 686 F.2d 793, 976 (9th Cir. 1982). Without that knowledge, Smith's termination could not have been retaliatory. Id.; see also Freitag v. Ayers, 468 F.3d 528, 542 (9th Cir. 2006). Smith does not argue or allege that Diamant revealed his complaints to Howard. According to the record, the only action Diamant took after receiving Smith's complaints was to re-interview one of the drivers Smith referred that Howard chose not to hire. Smith Dep. at 119:22. Diamant did not communicate Smith's complaints to Howard, discipline Smith, or document the complaints in any way that would alert Howard to their existence.

Because there is no evidence that Howard knew about Smith's complaints, the only evidence of retaliation is the time period between Smith's complaints and his discharge. For the reasons explained above, that evidence does not show causation. As a result, Smith has not made a prima facie case of retaliation. Therefore, inasmuch as Smith's Title VII claim relies on a theory of retaliation, the Court grants summary judgment.

### 2. **Nicholas & Co. Provided a Legitimate Non-Discriminatory Reason for Smith's Termination**

Because Smith made a prima facie case of disparate treatment through wrongful termination, the analysis continues to the second step of the McDonnel Douglas test. The burden of production now shifts to Nicholas & Co. to show a legitimate, nondiscriminatory reason for Smith's termination. McDonnel Douglas, 411 U.S. at 802–03. Nicholas & Co. points to Smith's part in the July 18, 2017 shipping breakdown as its justification for his discharge. The company believed that Smith neglected his work as Lead Driver that morning, which exacerbated the shipping delays and ultimately harmed the company. The following day, Nicholas & Co. launched an investigation to determine whether Smith violated the company's rules or policies. The results of that investigation resulted in Smith's discharge.

Nicholas & Co. administers employee discipline accordingly to its Rules of Conduct. The rules divide into two categories: rules that require termination regardless of whether it is the employee's first offense and rules that do not. Nicholas & Co. Rules of Conduct, ECF No. 17 Ex. A-2. The rules are clear, however, that any violation may justify termination depending on the

severity of the violation and the risk of harm to the company. Id. Smith received the Rules of Conduct when he was hired and acknowledged receipt by signature. Def.'s Mot. Summ. J. 3, ECF No. 17 Ex. A-3. Nicholas & Co.'s investigation uncovered three violations that it claims justify Smith's termination: (1) inappropriate conduct that may affect Company Goodwill; (2) a violation of the standards of behavior which the employer has a right to expect; and (3) insubordination, carelessness or inefficiency, or deliberate loafing or neglect of duty. Smith's Termination Letter, ECF No. 17 Ex. A-10; Diamant Decl. 6 ¶ 37.

Nicholas & Co. reviewed the security camera footage of the shipping yard and inspected the data on Smith's swipe card that gave him entry to different parts of the yard. Diamant Decl. 5 ¶ 25. Both the surveillance footage and swipe-card data showed that Smith drove his truck to the far side of the yard and stayed there nearly four hours while multiple other trucks were delayed. Id. When Diamant and Howard questioned Smith about his actions that morning, he told them he had left the yard to help an unknown driver. Id. ¶ 32. Diamant and Howard knew this to be untrue based on the camera footage and swipe-card data. The next day, Smith had another chance to clarify his actions during those four hours, but he declined. Id. ¶ 35. Howard and Diamant felt that Smith's dishonestly was more concerning than the actual shipping breakdown. Id. ¶ 36. Faced with Smith's apparent violations of company rules of conduct, his neglect of duty, and apparent dishonesty, Howard elected to terminate Smith's employment.

Because Nicholas & Co. discharged Smith according to its Rules of Conduct, the Court finds that the termination was legitimate and nondiscriminatory.

### 3. **Smith Has Not Presented Evidence that His Termination Was Pretextual**

At this point, Nicholas & Co. has rebutted the presumption of unlawful discrimination inherent in Smith's prima facie case. Hicks, 509 U.S. 502 at 507 (quoting Burdine, 450 U.S. at 255 n.10). And so, the burden reverts to Smith to demonstrate that Nicholas & Co.'s stated reason for his discharge was mere pretext to fire him because of his race.

Before reaching the merits of Smith's pretext argument, however, Nicholas & Co. urges the Court to apply the same-actor presumption in its favor. The same-actor presumption is an inference that an employer did not discriminate based on its prior positive employment actions

with that employee. It arises when the supervisor that is accused of unlawful discrimination is the same supervisor that hired the employee. See Coghlan, 413 F.3d at 1096. Indeed, a supervisor's "initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs." Id. That logic extends to a supervisor who promotes an employee and later discharges the same employee. See Hartsel v. Keys, 87 F.3d 795, 804 n.9 (6th Cir. 1996). If the Court applies the same-actor presumption in Nicholas & Co.'s favor, Smith must make an "extraordinarily strong showing of discrimination" to overcome summary judgment. Coghlan, 413 F.3d at 1097.

Nicholas & Co. is entitled to the same-actor presumption because Christopher Howard was the supervisor responsible for promoting Smith and terminating Smith. Both Howard and Diamant testified that, although employment decisions are collaborative, the ultimate decision to hire, fire, or promote an employee rests with the employee's immediate supervisor. Howard Decl. 2 ¶ 4; Diamant Decl. 3 ¶ 12. Howard was Smith's immediate supervisor during his tenure at Nicholas & Co. Smith Dep. at 20:9. Therefore, Howard had the ultimate decision to hire, promote, and terminate Smith.

Smith disputes this. He claims that Howard did not hire him and actively opposed his promotion. Pl.'s Resp. Summ. J. 14, ECF No. 21. However, Smith's argument that Howard did not have the final decision-making authority on employment is belied by his own testimony. In fact, part of Smith's grievance with Howard during his time as Night Lead was that Howard locked him out of the hiring process and made employment decisions by himself. Smith Dep. at 97:13. Smith's complaint to Diamant was that Howard told him "I'm going to interview who I want and hire who I want." Id. at 98:10–12. Thus, Smith's own testimony supports the fact that Howard was the ultimate decisionmaker when it came to hiring or promoting drivers that he supervised. Smith's own contradictory statements on that fact cannot create a material issue of fact. Ricci v. DeStefano, 557 U.S. 557, 591 (2009) (party cannot create an issue of fact "based on a few stray (and contradictory) statements in the record"). Accordingly, the Court finds that Nicholas & Co. is entitled to the same-actor inference, and Smith must present exceedingly strong evidence of pretext to avoid summary judgment.

Smith can meet his burden through direct or circumstantial evidence that Nicholas & Co.'s reason was pretextual. Aragon, 292 F.3d at 658–59. Direct evidence of pretext is evidence that "if believed, proves the fact [of discriminatory animus] without inference or presumption. Coghlan v. Am. Seafoods Co., LLC, 413 F.3d 1090, 1094–95 (9th Cir. 2005) (quoting Davis v. Chevron, 14 F.3d 1082, 1085 (5th Cir. 1994)). Such evidence leaves no question that the employer's motives were discriminatory, for example, an employer who directs overtly racist or sexist statements to an employee. Id. Direct evidence is so probative that little else is required to survive summary judgment. Id. at 1095. Circumstantial evidence, on the other hand, requires an additional inference of discriminatory intent. Id. There are two forms of circumstantial evidence that show pretext. The plaintiff can present evidence that the employer is biased or that the employer's stated explanation for its actions are not true. Id. (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). Either way, circumstantial evidence must be "specific and substantial" to overcome an employer's legitimate, nondiscriminatory explanation for its adverse employment action. Aragon, 292 F.3d at 659.

Smith has not met his burden. From what the Court can gather, Smith provides the following support for his pretext claim: (1) testimony that Howard did not like Smith because of his race (id.); (2) Howard's statements maligning Smith's work ethic (Smith Dep. at 55:11–12); and (3) Smith's testimony that the investigation into the July 18 shipping breakdown was a sham to provide a reason to terminate him (Pl.'s Resp. 17). In essence, Smith claims that Howard "made up pretextual and false allegations to fire Smith" but presents little evidence of that aside from his own testimony. Pl.'s Resp. at 2.

Taken together, Smith's evidence does not make the extraordinarily strong showing of discrimination to overcome Nicholas & Co.'s legitimate decision to discharge Smith in light of the same-actor presumption. The Court will start with Smith's argument that Nicholas & Co.'s investigation was a sham. The company provided the camera footage from its shipping yard that captured Smith's movements during the shipping breakdown. Surveillance Video Recordings, ECF No. 17 Exh. A-8. It also provided two sworn declarations explaining the surveillance footage. The video and declarations demonstrate that Smith parked his truck at the far side of the

yard at 2:53 a.m. and did not move for nearly four hours. Id.; Diamant Decl. ¶ 25. There is no evidence to support Smith's contention that Howard concocted the investigation as a ruse to discharge Smith, nor is there evidence that the surveillance video and declarations are not trustworthy. Smith's arguments boil down to self-serving statements unsupported by other evidence, which do not create a genuine issue of material fact. S.E.C. v. Phan, 500 F.3d 895, 909–10 (9th Cir. 2007) (at summary judgment, the Court may disregard "uncorroborated and self-serving" declarations).

Alternatively, Smith claims that, even if he did not leave the yard, his discharge was pretextual because he would have spent that time working in his truck. Pl.'s Resp. at 16–17. Because Smith did not have an office in the Nicholas & Co. facilities, he would have used his truck to send emails and help fix the various shipping delays. Id. He claims he regularly used the company's email system to send emails from his phone while in his truck. Id. at 19. However, Smith does not provide any of those emails or any other evidence that he spent that time working.

Likewise, Howard's comments about Smith's work ethic and Smith's belief that Howard did not like him because of his race do not show pretext. Smith believes Howard discharged him "because Howard did not like [him] personally and [Howard] did not like the color of [Smith's] skin." Pl.'s Resp. at 21. Smith also argues that Howard did not give African-American applicants a fair chance. Smith Dep. at 105:19. However, Howard's decision to promote Smith over other non-black applicants is evidence against such racial bias. Additionally, Smith admits that Howard indeed hired another African-American driver prior to his discharge. Id. at 62:4–12. He also asked Smith to train the new driver. Id. Again, Smith's own testimony is evidence against his claim of disparate treatment.

At bottom, Smith's self-serving testimony—unsupported by other evidence—is not specific and substantial enough to overcome Nicholas & Co.'s legitimate justification for Smith's termination nor does it overcome the same-actor presumption to which Nicholas & Co. is entitled. Therefore, the Court finds no genuine issue of material on which to deny Nicholas & Co.'s motion for summary judgment.

## IV. <u>Conclusion</u>

Accordingly, it is **HEREBY ORDERED** that defendant Nicholas & Co. Foodservice, LLC's motion for summary judgment (#17) is **GRANTED**.

The Clerk of the Court shall enter **JUDGMENT** in favor of defendant Nicholas & Co. Foodservice, LLC.

Dated this 16th day of May, 2019.

_____
Kent J. Dawson
United States District Judge